IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


TOD A. PABST,

                        Petitioner,

        vs.                                              Case No. 08-3258-SAC

DAVID MCKUNE, Warden, Lansing
Correctional Facility, and
STEPHEN SIX, Kansas Attorney General,

                        Respondents.


MEMORANDUM AND ORDER

        This case comes before the court on petitioner's petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254. Respondents filed an Answer and Return (Dk.

20), and no Traverse has been filed. Petitioner alleges that his Fourteenth Amendment

right to due process was violated during his second trial because a victim's family hired

a private prosecutor[1] who simultaneously assisted in prosecution of the criminal case

against petitioner and represented the victim's family in related civil matters against

petitioner, and thus had a conflict of interest. Petitioner also contends he was denied his

Sixth Amendment right to effective assistance of trial and appellate counsel.

**Factual Background and Procedural History**

        The relevant facts giving rise to this writ are undisputed. Petitioner was convicted

of first-degree murder in the District Court of Thomas County, Kansas, in August of

1997. The Kansas Supreme Court subsequently reversed petitioner's conviction and

---

[1]For purposes of convenience, the court refers to the associate counsel hired by
a prosecuting witness to assist the county attorney in accordance with KSA 19-717, as
a private prosecutor.

remanded the case, finding the prosecutor's remarks in closing argument denied him a fair trial. *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000).

> Upon the retrial in 2000, the victim's parents hired a private attorney, Pedro Irigonegaray, to act as associate counsel to assist the prosecutor, pursuant to K.S.A. 19-717. Irigonegaray actively participated in the murder trial. At the time, he was also employed to assist with civil litigation which would be impacted by the outcome of the criminal trial.

*Pabst v. State*, 287 Kan. 1, 3, 192 P.3d 630, 633 (2008). Following petitioner's retrial in the District Court of Ellis County, Kansas, at which Irigonegaray served as a private prosecutor, petitioner was again convicted of first-degree murder and was sentenced to a term of life without parole for 25 years. The Kansas Supreme Court affirmed that conviction. *State v. Pabst*, 273 Kan. 658, 44 P.3d 1230, *cert. denied*, 537 U.S. 959 (2002).

Thereafter, petitioner filed a post-conviction action pursuant to K.S.A. 60-1507 in the District Court of Thomas County, Kansas. The district court denied relief, and the Kansas Supreme Court subsequently affirmed that decision. *Pabst v. State*, 287 Kan. 1, 192 P.3d 630 (2008). The Kansas Supreme Court's decision on petitioner's state collateral appeal provides the following details about Irigonegaray's participation as a private prosecutor during petitioner's second trial:

> Irigonegaray related that he was retained by the victim's sister and parents to be an associate to the attorney general's office under K.S.A. 19-717 to assist with the prosecution of the murder trial. Irigonegaray admitted that he represented the victim's sister and her husband in a termination of parental rights and adoption case involving Pabst's child. At the time of the criminal retrial, Pabst had filed a motion to set aside the termination, and Irigonegaray was involved in the case. Irigonegaray's office was also involved in other civil cases involving the victim's family which were at least prompted by the murder, albeit the record is not altogether clear on the details of those cases or the extent of Irigonegaray's involvement.
> Although Irigonegaray admitted involvement in the civil cases, he denied

2

that he ever used information from the civil cases to gain an advantage in the criminal trial. However, he did admit that the murder conviction had some impact on the attempt to set aside his client's adoption of Pabst's child. Further, Irigonegaray did use the fact that Pabst had filed two civil cases involving property to argue for a hard 40 sentence based on murder for financial gain, although the sentencing court rejected the argument and refused to impose the enhanced minimum sentence.

Assistant Attorney General Stephen Maxwell testified on the State's behalf, acknowledging that he was the lead attorney on the case and had assigned the handling of several parts of the trial to Irigonegaray. Specifically, he assigned Irigonegaray the opening statement, 7 out of 25 State witnesses, 1 or 2 of the defense witnesses, and a portion of the closing argument. However, Maxwell asserted that he controlled the case and everything that Irigonegaray did on the case was subject to Maxwell's prior approval.

*Pabst v. State*, 287 Kan.1, 4-5, 192 P.3d 630 (2008).

**The Present Federal Petition**

After denial of his state court habeas writ, petitioner filed this writ in federal court, which this court previously found to be timely. *Pabst v. McKune*, 2009 WL 4508573 (D.Kan. 2009). The parties raise no claims of procedural default, and agree that petitioner has exhausted his administrative remedies. Two issues[2] are raised in this petition: (1) whether petitioner's Fourteenth Amendment right to due process was violated because of Irigonegaray's conflict of interest in simultaneously acting as a private prosecutor during petitioner's second criminal trial and representing the victim's family in civil litigation against petitioner; and (2) whether petitioner was denied effective

---

[2]Sufficiency of the evidence, although stated in the petition and briefed by respondents, has not been brief by petitioner, *see* Dk. 9. By failing to include that issue in his brief, petitioner has waived that issue. *See Yanez v. Vallejos*, 195 Fed.Appx. 775 (10th Cir. 2006) (finding claims stated in petition for writ of habeas corpus waived if not raised on appeal).

assistance of counsel by counsels' failure to raise the issue of the private prosecutor's

conflict of interest either at trial or on appeal, in violation of petitioner's Sixth

Amendment right. Dk. 9, p. 2.

Two issues are not before the court. First, the court need not decide whether

Irigonegaray's serving as a private prosecutor is legal. Kansas is among those states

whose statutes continue to permit such an arrangement, and that statute is not alleged

to be facially unconstitutional. It states:

> That the prosecuting witness in any criminal action or proceeding may, at
> his own expense, employ an attorney or attorneys to assist the county attorney to
> perform his duties in any criminal action or proceeding under any of the laws of
> the state of Kansas, and such attorney or attorneys shall be recognized by the
> county attorney and court as associate counsel in such action or proceeding, and
> no prosecution shall be dismissed over the objection of such associate counsel
> until the reason of the county attorney for such dismissal, together with the
> objections thereto of such associate counsel, shall have been filed in writing,
> argued by counsel, and fully considered by the court.

KSA § 19-717.

Nonetheless, as the Kansas Supreme Court recognizes, the statute gives rise to

an inherent conflict of interest:

> K.S.A. 19-717 appears to implicitly set up an inherent conflict, regardless
> of the existence of concurrent civil litigation. As noted, the statute provides for the
> prosecuting witness to employ and pay for the "associate counsel." With regard
> to the loyalties owed because of that employment, we have said "[a]n attorney is
> obligated to act in the best interests of his or her client which, in the case of an
> attorney hired pursuant to K.S.A. 19-717, is the complaining witness who
> retained the attorney's services." *Dressel*, 241 Kan. at 434, 738 P.2d 830. Yet,
> *Dressel* also recognized that an attorney retained by the victim pursuant to
> K.S.A. 19-717 is "hired to assist the prosecution." 241 Kan. at 434, 738 P.2d 830.
> As such, the *Dressel* court found the victim-retained associate counsel in that
> case to be subject to at least a portion of the ethical rules explicitly applicable to
> prosecutors, then designated as DR 7-103 and currently contained in Rule 3.8 of
> the Kansas Rules of Professional Conduct (KRPC) (2007 Kan. Ct. R. Annot.
> 525). *Dressel* recognized that the "peculiar role of an attorney who is privately
> retained by a complaining witness to assist in a criminal prosecution" would

4

necessitate compromise and a balancing of the interests the attorney represents. 241 Kan. at 434, 738 P.2d 830.

*Pabst v. State*, 287 Kan.1, 10,192 P.3d 630, 637 (2008). Irigonegaray thus actively represented conflicting interests during the second trial by virtue of his status as a private prosecutor, even disregarding the pendency of the civil cases.

Secondly, this court need not decide whether Irigonegaray in fact had a conflict of interest due to his simultaneous representation of the victim's family in civil litigation against petitioner while serving as a private prosecutor in petitioner's criminal case. That issue has already been decided by the Kansas Supreme Court, which found such a conflict. *Pabst*, 827 Kan. 1.

> Granted, we have pointed out that there is an inherent difference between the attorney occupying the public office of prosecutor and an attorney hired by the prosecuting witness to assist the public prosecutor. The public prosecutor is expected to be conflict-free, whereas we have acknowledged that the victim-retained "assistant" comes to the table with built-in divided loyalties. Nevertheless, we need not exacerbate the inherent conflict by absolving the retained attorney of all of the prosecutorial constraints of K.S.A. 19-705.[3] Therefore, we find the K.S.A. 19-717 attorney is subject to the statutory conflict rule of K.S.A. 19-705, *i.e.*, the victim-retained attorney is precluded from representing a party in a civil action that depends on the same state of facts as the ongoing criminal prosecution in which the attorney is assisting the public prosecutor.

*Pabst*, 287 Kan. 1, 12-13. That finding is not challenged by the parties. Thus during petitioner's second criminal trial, Irigonegaray not only bore the "inherently conflicted" role of being a private prosecutor pursuant to KSA 19-717, but also simultaneously

---

[3]KSA 19-705 states in relevant part: "No county attorney shall receive any fee or reward from or on behalf of any prosecutor or other individuals, except such as are allowed by law for services in any prosecution or business to which it shall be his official duty to attend, nor be concerned as attorney or counsel for either party, other than the state or county, in any civil action depending upon the same state of facts upon which any criminal prosecution, commenced but undetermined, shall depend..."

represented the victim's family in pending and factually dependent civil suits against the petitioner in violation of KSA 19-705, exacerbating his conflicts of interest.[4]

**Standard of review**

A federal court does not sit as a super state appellate court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). This court can grant relief only for a violation of federal law. *See Morris v. Burnett*, 319 F.3d 1254, 1277 (10th Cir. 2003). In reviewing a state prisoner's petition pursuant to 28 U.S.C. § 2254, the federal court must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." *Id.* The propositions of error, as raised by appellate counsel on direct appeal and adjudicated on the merits by the Kansas Supreme Court are exhausted and subject to review under the standards set forth in the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Turrentine v. Mullin*, 390 F.3d 1181, 1188 (10th Cir.2004). Under AEDPA, an applicant is entitled to federal habeas relief only if he can establish that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *see also Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); *Hale v. Gibson*, 227 F.3d 1298, 1309 (10th Cir. 2000).

---

[4]In federal court, similar conflicts by U.S. Attorneys are prohibited. See 28 U.S.C.A. § 528 (requiring the Attorney General to promulgate rules which require the disqualification of any officer or employee of the Department of Justice from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict of interest, or the appearance thereof.)

A state court decision is "contrary to" clearly established federal law for purposes of § 2254 if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the result reached by the Supreme Court. *Williams*, 529 U.S. at 405-406. It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be "diametrically different," "opposite in character or nature," or "mutually opposed" to the Supreme Court decision itself. *Id.* at 406.

A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id, at 413. "AEDPA's conception of objective unreasonableness lies 'somewhere between clearly erroneous and unreasonable to all reasonable jurists.' " *House v. Hatch*, 527 F.3d 1010, 1019 (10th Cir. 2008) (quoting *Maynard v. Boone*, 468 F.3d 665, 670 (10th Cir. 2006)). "Thus, 'only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254.' " *Id.* (quoting *Maynard* at 671). When a state court determines that a constitutional violation is harmless, a federal court may award habeas relief under § 2254 if the harmlessness determination itself was unreasonable. *Fry v. Pliler*, 551 U.S. 112, 118, 127 S.Ct. 2321, 2326, 168 L.Ed2d 16 (2007).

Under this standard, judicial review is directed to the result of the state appellate court's decision, not its reasoning. *See Gipson v. Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004). Factual findings by the state trial and appellate courts are presumed to be

correct, and petitioner has the burden to rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Darks v. Mullin*, 327 F.3d 1001, 1007 (10th Cir.), *cert. denied*, 540 U.S. 968 (2003); *Smallwood v. Gibson*, 191 F.3d 1257, 1265 (10th Cir.1999). Here, neither petitioner nor respondents challenge the factual findings of the state court.

**Due process, generally**

"Due process of law requires fundamental fairness, *i.e.*, a fair trial in a fair tribunal." *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). "Fundamental fairness," as a by product of due process, is "a term whose meaning can be as opaque as its importance is lofty." *Lassiter v. Department of Social Services of Durham County, N. C.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). To succeed on this issue, petitioner must show the prosecutor's conflict rendered his trial fundamentallyunfair. *See Short v. Sirmons*, 472 F.3d 1177, 1195 (10th Cir. 2006). Whether or not actions by a prosecutor in a criminal trial render the trial fundamentally unfair is a judgment that the federal habeas court makes after reviewing the challenged actions in light of the entire record and assessing the relevant precedents and other interests at stake. *Lassiter*, 452 U.S. at 25.

**Prosecutors' duties, generally**

"It is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters." *Young v. U.S. ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 810, 107 S.Ct. 2124, 2139 (1987). Accordingly, a prosecutor's duty is to insure that justice is done, and not simply to seek convictions. *Berger v. United States*, 295 U.S.

78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). "[T]he prosecutor's role transcends that of an adversary" because the prosecutor, acting as the representative of the sovereign, has an obligation to ensure " 'not that it shall win a case, but that justice shall be done.' " *Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801, 823 (10th Cir. 1995) (quoting *Berger*, 295 U.S. at 88). "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of justice suffers when any accused is treated unfairly." *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The prosecutor's interest is thus unlike that of other parties to a controversy,[5] as the United States Supreme Court explained in *Berger*:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting

---

[5]The Kansas Supreme Court focused upon this unique role in reversing this petitioner's first trial for prosecutorial misconduct, stating, "...a prosecutor is a servant of the law and a representative of the people of Kansas" who bears a "remarkable responsibility ... when rising in a courtroom to announce an appearance for the State of Kansas." *State v. Pabst*, 268 Kan. 501, 510 (2000).

attorney, will be
faithfully observed.

*Berge*r, 295 U.S. at 88-89. Prosecutors must be disinterested, but "may not necessarily

be held to as stringent a standard of disinterest as judges. 'In an adversary system,

[prosecutors] are necessarily permitted to be zealous in their enforcement of the law,'

*Marshall v. Jerrico*, Inc., 446 U.S. 238, 248, 100 S.Ct. 1610, 1616, 64 L.Ed.2d 182

(1980)."*Youn*g, 481 U.S. at 807.

**Private prosecutors' duties**

Kansas has not squarely decided whether a KSA 19-717 private prosecutor is

subject to the same high standards of conduct in the trial of the case as is the public

prosecutor. It has, however, generally noted the "drastic difference" between the "public"

and the "private" prosecutor:

> From his sole function as procured advocate for a prosecution, the duties
> of the public prosecutor have taken new dimensions. He is not an advocate in the
> ordinary sense of the word, but is the people's representative, and his primary
> duty is not to convict but to see that justice is done. The prosecutor is an officer
> of the state who should have no private interest in the prosecution and who is
> charged with seeing that the criminal laws of the state are honestly and
> impartially administered, unprejudiced by any motives of private gain. It is his
> duty to show the whole transaction as it was, regardless of whether it tends to
> establish a defendant's guilt or innocence.
> Conversely, a privately retained attorney owes his client individual
> allegiance, and once employed he must not act for an interest even slightly
> adverse to that of his client in the same general matter. Therefore, in view of the
> ethical and judicial restrictions imposed on the public prosecutor and the
> generally recognized loyalties of the private advocate, 'private prosecutor' is a
> contradiction in terms. The high standard of impartiality demanded of a
> prosecutor realistically cannot be expected of the private advocate.

*State v. Berg*, 236 Kan. 562, 567-568, 694 P.2d 427, 431-432 (1985) (quoting with

approval *Note, Private Prosecution-The Entrenched Anomaly*, 50 N.C.L.Rev. 1171,

1173 (1972).)

**Structural v. trial error**

Petitioner contends that Irigonegaray's conflicts of interest constitute structural error which compels relief even in the absence of prejudice to the defendant or control by the private prosecutor.

> Although most constitutional errors can be harmless, some are so offensive to our judicial system that they require automatic reversal. *Arizona v. Fulminante*, 499 U.S. 279, 306-09, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "These violations, termed 'structural errors,' involve defects in the 'trial mechanism' and affect 'the framework within which the trial proceeds' 'from beginning to end.' " *United States v. Lott*, 433 F.3d 718, 722 (10th Cir. 2006) (quoting *Fulminante*, 499 U.S. at 309-10, 111 S.Ct. 1246). "Structural errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " *United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005) (quoting *Rose v. Clark*, 478 U.S. 570, 577-78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)). "[A] defining feature of structural error is that the resulting unfairness or prejudice is necessarily unquantifiable and indeterminate, such that any inquiry into its effect on the outcome of the case would be purely speculative." *Id.* (internal quotations omitted). On the other hand, trial errors which are not deemed structural remain subject to harmless error review. *See Fulminante*, 499 U.S. at 306-07, 111 S.Ct. 1246.

*United States v. Solon*, 596 F.3d 1206, 1212 (10th Cir. 2010) (finding a district judge's absence from the bench for six minutes during defense counsel's closing argument was not structural error). Finding error to be structural is "the exception and not the rule" and "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 578-79, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)." *Webber v. Scott*, 390 F.3d 1169, 1176 (10th Cir. 2004).

Trial error is "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence

presented in order to determine whether its admission was harmless beyond a

reasonable doubt." *Fulminante*, 499 U.S. at 307-08. Respondents contend that

Irigonegaray's conflicts should be assessed by the harmless error standard.

In determining whether error is structural or trial error, the court considers the

nature, context, and significance of the violation.

> [T]he determination of whether an error is structural depends on not only the right
> violated, but also the "nature, context, and significance of the violation." *Id.* For
> example, the total deprivation of the right to counsel constitutes structural error,
> while the denial of the right to counsel at a preliminary hearing is subject to
> harmless error review. (Citations omitted.) Similarly, although the unjustified
> exclusion of a defendant from the entire trial would constitute structural error, a
> defendant's absence when the judge engaged in two conversations with a juror
> has been subjected to harmless error analysis. (Citations omitted.)

*United States v. Pearson*, 203 F.3d 1243, 1261 (10th Cir. 2000) (holding prosecutor's

manipulation of system to get cases assigned to a particular judge raised substantial

due process concerns, but any error was not structural).

> The Supreme Court has found structural error, subject to automatic
> reversal, only in a very small number of cases. *See Neder v. United States*, 527
> U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (further citations omitted)
> (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71
> L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct.
> 617, 88 L.Ed.2d 598 (1986) (racial discrimination in grand jury selection);
> *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)
> (denial of right to self-representation at trial); *Waller v. Georgia*, 467 U.S. 39, 104
> S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan*, 508 U.S. 275,
> 113 S.Ct. 2078, 124 L.Ed.2d 182 (defective reasonable doubt instruction)).

*Walker v. Gibson*, 228 F.3d 1217, 1235 (10th Cir. 2000), *overruled on other grounds by*

*Neill v. Gibson*, 278 F.3d 1044, 1057 n. 5 (10th Cir. 2001).

The Tenth Circuit has, on occasion, found structural error in other contexts. *See*

*e.g.*, *United States v. Iribe-Perez*, 129 F.3d 1167 (10th Cir. 1997) (reversing, even

absent showing of prejudice, where defendant's fundamental right to trial by impartial jury was violated by jury selection from panel which had been erroneously informed that defendant was going to plead guilty to the same crime of which they ultimately convicted him); *United States v. Wiles*, 102 F.3d 1043, 1056 (10th Cir. 1996) (holding that because the jury did not render a verdict on an essential element of the crime, the district court's failure to instruct on that element was structural error), *modified*, 106 F.3d 1516 (10th Cir.1997), *judgment vacated on other grounds*, *United States v. Schleibaum*, 522 U.S. 945 (1997)).

**Young**

Petitioner's contention that Irigonegaray's conflicted participation is a per se violation of due process is grounded on *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (plurality opinion). There, defendants to a trademark infringement lawsuit agreed to its settlement and consented to a permanent injunction, then violated its terms. Attorneys for the infringed corporation sought and were granted approval to serve as special prosecutors to bring criminal contempt charges against the defendants for their violation of the court's order. They were thus in control of the prosecution. A four-justice plurality held that the appointment of counsel for an interested party in the underlying civil litigation as special prosecutors in a criminal contempt proceeding was an error " 'so fundamental and pervasive' " as to require reversal without any prejudice analysis. *(Id.* at p. 809, 107 S.Ct. 2124. (Per Justice Brennan with three Justices concurring and one Justice concurring in judgment.)

... the attorney could not discharge the obligation of undivided loyalty to both

13

clients where both have a direct interest. The Government's interest is in dispassionate assessment of the propriety of criminal charges for affronts to the Judiciary. The private party's interest is in obtaining the benefits of the court's order. While these concerns sometimes may be congruent, sometimes they may not. A prosecutor may be tempted to bring a tenuously supported prosecution if such a course promises financial or legal rewards for the private client. Conversely, a prosecutor may be tempted to abandon a meritorious prosecution if a settlement providing benefits to the private client is conditioned on a recommendation against criminal charges.

*Young*, 481 U.S. at 805.

The rationale for *Young's* plurality was threefold. First, the court explained that the prosecutor has a critical role in criminal proceedings, comparable to that of a conflicted judge, a discriminatorily selected grand jury, or a petit jury exposed to biasing publicity, all of which constitute fundamental error regardless of actual prejudice. 481 U.S. at p. 810. Second, the plurality noted that an interested prosecutor creates an appearance of impropriety, reasoning that "[a] concern for actual prejudice in such circumstances misses the point, for what is at stake is the public perception of the integrity of our criminal justice system." *Id*, at p. 811. Third, the plurality explained the difficulty in showing prejudice:

[a]ppointment of an interested prosecutor is also an error whose effects are pervasive. Such an appointment calls into question, and therefore requires scrutiny of, the conduct of an entire prosecution, rather than simply a discrete prosecutorial decision. Determining the effect of this appointment thus would be extremely difficult. A prosecution contains a myriad of occasions for the exercise of discretion, each of which goes to shape the record in a case, but few of which are part of the record.

*Young*, at pp. 812-813.

**Webber**

Respondents accurately counter that the structural error conclusion did not carry a majority of the Supreme Court in *Young*, *see* 481 U.S. at 789, 809-14 (that portion of

the opinion was joined only by Justices Brennan, Marshall, Blackmun, and Stevens) and therefore, is not the prevailing opinion of the Supreme Court. Respondents contend that in order to establish that his trial was rendered fundamentally unfair, petitioner must show prejudice, as the Tenth Circuit explained in *Webber v. Scott*, 390 F.3d 1169 (10th Cir. 2004).

In *Webber*, the court appointed an attorney to serve as a child advocate for a sexual abuse victim, as required by statute. Defendant alleged the advocate's extensive participation in his trial violated his Fourteenth Amendment due process right to a fair trial. In determining that the error was trial error subject to harmless error review, the Tenth Circuit distinguished *Young*, finding that the child advocate did not control critical prosecutorial decisions, did not have a direct personal interest in the outcome of the case which would be to the advantage of the client, and that the child advocate's participation was "manifestly different than those errors that are considered structural." 390 F.3d at. 1176. *Webber* concluded that the involvement of the child advocate may have had some impact on Webber's trial, but not a "substantial and injurious" one. 390 F.3d at 1177.

Here, of course, Irigonegaray had a pre-existing relationship with the victim's family, and had a personal or continuing interest in the outcome of the criminal case which would be to the advantage of his civil client, beyond simply vindicating the public's interest in justice. He was not, however, the sole representative of the government, and did not control the criminal case against the petitioner. The present case is thus factually distinct from both *Young* and *Webber*.

The Tenth Circuit has held that "the participation of a privately-retained

attorney in a state criminal prosecution does not violate the defendant's right to due process under federal law unless the private attorney effectively controlled critical prosecutorial decisions." *Erikson v. Pawnee County Bd. of County Comm'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001), *cert. denied*, 535 U.S. 971 (2002). *See East v. Scott*, 55 F.3d 996, 1000-01 (5th Cir.1995); *Person v. Miller*, 854 F.2d 656, 663-64 (4th Cir.1988). *Erickson* does not, however, include a structural error analysis, *Webber*, 3980 F.3d at 1176, and does not address the factual scenario presented here, where the private prosecutor not only represents the state by virtue of his assistance to the county attorney and represents the victim's family by virtue of his employment by them, but also represents the victim's family in pending civil cases.

Nonetheless, the court finds the degree of control exercised by the private prosecutor to be a crucial factor in the due process analysis. When the county attorney retains control of the case, the purpose of a public prosecution in preventing the use of criminal law to achieve personal gain is achieved.

> Unquestionably, a private individual has no longer any right to prosecute another for crime-no right to control any criminal prosecution when once instituted. A criminal prosecution is a state affair, and the control of it is in the public prosecutor.... The purpose of a public prosecution is to prevent the use of the criminal law to gratify private malice or accomplish personal gain. This purpose is fully subserved when the control of the case is with the county attorney.

*State v. Wilson*, 24 Kan. 189, 192 (1880). *See Cunningham v. Neagle*, 135 U.S. 1, 10 S.Ct. 658 (1890).

When the public prosecutor controls the criminal case, the opportunities for a private prosecutor to have actual conflicts are minimal. Because the public prosecutor exercises his own discretion in making critical prosecutorial decisions outside the

courtroom, such as, "which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity," *Young*, 481 U.S. at 807, the potential for private interest to influence the discharge of public duty is minimal. Similarly, a private prosecutor's actions inside the courtroom or during trial are particularly susceptible of judicial control. The court's confidence that a prosecution can be conducted in disinterested fashion is not undermined where the public prosecutor "plays the critical role of preparing and presenting the case for the defendant's guilt." *Compare Young*, 481 U.S. at 811.

Similarly, when the public prosecutor controls the criminal case, no appearance of impropriety diminishes the jury's or observers' faith in the fairness of the criminal justice system in general. Although "justice must satisfy the appearance of justice," *Offutt v. United States*, 348 U.S. 11, 13, 75 S.Ct. 11, 99 L.Ed. 11 (1954), the public perception of the integrity of our criminal justice system is not skewed if a private prosecutor merely assists in and does not control the prosecution.

Additionally, the appointment of a conflicted, interested private prosecutor is an error whose effects can be determined. The difficulty in showing prejudice is unlike the difficulty in showing prejudice from one who controls the entire case and whose effects are therefore pervasive. Because the private prosecutor's acts, role, and participation are limited, the court can scrutinize his conduct and its effects more easily than if he controlled the case and exercised discretion on multiple occasions, "each of which goes

to shape the record in a case, but few of which are part of the record." *Young*, 481 U.S. 812-13.

The court's review of the record in this case shows that Irigonegaray was not in control of the prosecution against petitioner. The testimony of Assistant A.G. Maxwell and of Irigonegaray during petitioner's state habeas proceeding[6] establishes that Maxwell was the lead prosecutor in the case, that he remained in control of the case at all times, that he made the critical prosecutorial decisions, that he exercised prosecutorial discretion, that he delegated certain tasks during trial to Irigonegaray, and that Irigonegaray did nothing in the criminal case without Maxwell's prior approval. Irigonegaray was assigned the opening statement, seven out of 25 State witnesses, one or two the defense witnesses, and a portion of the closing argument.[7] Quantitatively and qualitatively, Irigonegaray played a subservient role. The court finds, and petitioner does not dispute, that Maxwell was in actual control of the prosecution-both formally and in practical effect.

Additionally, the court finds it significant, in assessing the appearance of impropriety, that the jury was informed at the beginning of the petitioner's second trial, both by the judge and by Maxwell, of Irigonegaray's status as a private prosecutor. Specifically, Judge Schiffner stated:

> Mr. Irigonegaray is an attorney out of Topeka, and I might tell you that Kansas law does provide that prosecuting witnesses in a criminal case are

---

[6] *See* R. VI, 77, 85-86, 96, 127-33, 135-36, 139, 141-42, 174-79, 188.

[7] If so assigned by the district attorney, the private prosecutor may take an active role in the proceedings, and is not confined to taking notes and advising the district attorney. *State v. Baker*, 249 Kan. 431, 445, 819 P.2d 1173, 1184 (1991).

entitled, at their own expense, to employ an attorney to assist the prosecution, and that's a capacity in which Mr. Irigonegaray appears today as associate counsel.

R. Vol. 10, p. 8. Similarly, Maxwell informed the jury: "Mr. Irigonegaray is an associate counsel to me, assisting me and under my control, in assisting me in the public prosecution duties that I have in this case. He was hired by the victim's family in order to assist me." *Id.*, p. 18. Granted, the jury was never informed that Irigonegaray also represented the victim's family in pending civil cases, but that additional information was likely meaningless to them in their perception of the integrity of our criminal justice system.[8] The jury's knowledge that Irogonegaray was hired by the victim's family enabled them to understand his motivations, to weigh his statements, and to judge his actions accordingly in the criminal prosecution.

Lastly, the court is able to segregate the effects of the error in this case. The errors claimed by petitioner shall be addressed specifically, below.

For the reasons stated above, the court finds any error in the present case to be trial error and not structural error.

**Harmless error**

In a § 2254 proceeding a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht*, v. Abrahamson, 507 U.S. 619, 623 (1993). *Fry v. Pliler*, 551 U.S. 112, 121, 127 S.Ct. 2321, 2328 (2007). *See Welch v. Workman*,

---

[8]*See Pabst*, 268 Kan. at 509 (finding "a jury likely sees little difference (and there is none) between the prosecutor personally calling the defendant a liar and the "State" calling the defendant a liar.")

607 F.3d 674 (10th Cir. 2010). That standard is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The court also imports the deferential AEDPA standard into this analysis. *See Littlesun v. Parker*, 2010 WL 2113968 (10th Cir. May 27, 2010).

The record shows that at the time Irigonegaray served as a private prosecutor, he was pursuing civil litigation to sever petitioner's parental rights, to secure the adoption of petitioner's daughter by the victim's sister, to keep petitioner from collecting on a life insurance policy after the first conviction, and to keep petitioner from possessing real property that he jointly owned with the victim. (R. III, Exhibit 18; R. IV, 495–501). Irigonegaray used petitioner's conviction to serve the interests of his civil clients in these matters. In a Jefferson County, Kansas, case Mr. Irigonegaray represented Sara Oliver, the victim's sister. (R. III, Exhibit 13). After petitioner's first trial found him guilty and before that verdict was reversed on appeal, Irigonegaray obtained an order severing petitioner's parental rights to his daughter, based in large part upon his murder conviction. (R. IV, 495–501; VI, 100, 104). After the conviction was reversed, petitioner filed a motion seeking relief from the order severing his parental rights, which was pending at the time of the retrial. (R. III, Exhibit 14). Irigonegaray, representing the victim's family, was granted a motion of continuance on petitioner's civil motion until after the second criminal trial. (R. III, Exhibit 15; VI, 108). Using the second conviction which he helped secure, Irigonegaray defeated petitioner's motion to restore his parental rights. (R. VI, 108). Irigonegaray also used petitioner's conviction to secure adoption rights to petitioner's daughter. (R. VI, 148). Petitioner's conviction made it

possible for his daughter to be adopted by the victim's family.

Irigonegaray also represented the victim's family and her estate in disputes against petitioner involving two pieces of real estate located in Thomas County, Kansas, which had been purchased by petitioner and the victim. (R. III, Exhibit 18, 22). As a result of the first conviction, a one-half interest in the property transferred to petitioner's minor daughter, whose guardian was the victim's sister. If acquitted at the second trial, petitioner would have taken title to this property, but a second conviction ensured that the estate would retain its one-half interest in the property. (R. III, Exhibit 21).

Irigonegaray also litigated against petitioner with regards to the victim's life insurance policy which named him as beneficiary. (R. III, Exhibit 23). As a result of the first conviction, petitioner's portion of the proceeds ($17,250) was paid to the victim's parents and sister. (R. III, Exhibit 23). Irigonegaray admitted at the 1507 hearing that the estate, which he represented, would be an interested party in any matter involving the victim's insurance policy. (R. VI, 121). Petitioner's conviction after the second trial defeated any claim petitioner would have had against the estate of the victim for his portion of the life insurance proceeds. (R. VI, 149). In each of these matters, the fact of conviction benefitted Irigonegaray's civil clients.

The more relevant inquiry for purposes of this action is, however, what effect Irigonegaray's multiple conflicts had upon petitioner's criminal prosecution in 2000. Petitioner notes three acts: 1) opposing petitioner's motion to correspond with his daughter; 2) opposing petitioner's motion to interview his daughter; and 3) using facts gained in civil litigation in support of seeking a "Hard 40" sentence. These are addressed in detail below.

First, Irigonegaray opposed petitioner's motion to correspond with his daughter. Two months after Irigonegaray entered his appearance in the criminal case, his office wrote a letter to the Sheriff's Office where petitioner was being held, noting that his office represented the guardian of petitioner's daughter, and stating the guardian's request that petitioner not be permitted to send mail to his daughter since his parental rights had been severed. (R. III, Exhibit 2). Subsequently, petitioner filed a motion in the criminal case seeking to allow him to correspond with his daughter. Irigonegaray opposed the motion, allegedly on behalf of the State of Kansas, (R. III, Exhibit 3), but stated: "[T]he individuals who have responsibility for the minor choose to have him have no contact with her whatsoever . . . we don't want him to communicate with her. We will not accept any of those letters, and he should not be permitted to harass a witness in this case, i.e. the parent . . . . We strongly object to this and request the Court not to permit it." (R. XVI, 81–82). Irigonegaray admitted that by "we," he meant the Olivers. The court found, however, that it had no authority to contravene the jail's administrative regulations, thus the matter was outside the context of the criminal prosecution. *See* 287 Kan. at 14. Petitioner does not specifically allege that this matter had any impact upon his conviction. Because the court had no authority to do what petitioner sought, the role taken by Irigonegaray in the matter and the conflicts under which he labored mattered not.

Second, when petitioner filed a motion seeking an order from the district court permitting the defense to interview his daughter, who was in the house when the victim was shot, Irigonegaray opposed it allegedly on behalf of the State of Kansas. (R. III, Exhibit 4). Attached to his response was an affidavit he had prepared from the

daughter's guardian, stating that she withheld consent for the child's interview. At the hearing on petitioner's motion, Irigonegaray argued that it was daughter's legal guardian, not the State of Kansas, who was opposing the interview. (R. XVI, 86–90). The State took no position on the motion beyond the one espoused by Irigonegaray. (R. XVI, 89–90). The court ruled that the State had no right to deny petitioner the right to interview the witness, but the court had no authority to compel the interview, thus this issue, like the one above, was outside the context of the criminal prosecution. Petitioner does not specifically allege Irigonegaray's conflicts of interest in this matter had any impact upon his conviction. Because the court had no authority to compel the interview petitioner desired, the fact that Irigonegaray's position on the matter may have been motivated by his interest in his civil case rather than by a proper interest in the criminal case is immaterial. Had the State had opposed the motion and Irigonegaray had remained silent, or had neither the State nor Irigonegaray opposed the motion, the outcome would have been no different.

Lastly, petitioner points to Irigonegaray's actions relating to sentencing, contending he requested imposition of a Hard 40 sentence, and called the victim's family to give statements with regard to sentencing. (R. XV, 6–7, 15, 31–34, 37–38). As a private prosecutor, Irigonegaray filed a "Notice of Intent to Seek a Mandatory Term of Imprisonment of 40 Years." (R. III, Exhibit 7). The aggravating factor Irigonegaray used in seeking the Hard 40 was that petitioner committed murder for the purpose of receiving financial gain, *i.e.*, personal property and real property titled to the victim and petitioner's mother. (R. III, Exhibit 7). Irigonegaray also filed the "State's Pre-Sentencing Memorandum." (R. III, Exhibit 8), noting that in support of the Hard 40 the State would

present: "evidence of harassing litigation brought against some of the victim's family by defendant subsequent to his earlier sentencing." (R. III, Exhibit 8). Irigonegaray later acknowledged that this referred to the civil lawsuits dealing with the disputed property and life insurance matters. (R. VI, 115–116, 147). The sentencing court, however, rejected the argument and refused to impose the enhanced minimum sentence. Accordingly, no actual prejudice to petitioner from Irigonegaray's conflicts of interest has been shown.

The record reflects understandable confusion about the role as a private prosecutor, as Irigonegaray signed the Motion to Quash Subpoena Duces Tecum, the Notice of Intent to Seek a Hard 40 Sentence, the State's Presentencing Memorandum and the Suggested Changes to Juror Questionnaire as the "attorney for Dale and Jan Harkins." (R. VI, 92–98). When asked at the state 1507 hearing whom he represented when he filed those motions, Irigonegaray replied: "Well, clearly, pursuant to statutory authority, I am only representing the State of Kansas. The fact is, I cannot deny that at the same time we were involved in representing the Harkins." (R. VI, 93).

Additionally, the matters regarding petitioner's daughter, the signatures, and petitioner's sentencing were for the court's decision, not the jury's. They occurred outside the presence of the jury, and the jury had no knowledge of them. Petitioner does not assert that Irigonegaray did or said anything in the presence of the jury that could have negatively impacted him, flowing from Irigonegaray's involvement in the civil cases. Although the acts noted above amply demonstrate the presence of Irigonegaray's conflicts of interest, they fail to show that those conflicts in any way prejudiced the petitioner's right to a fair trial or impacted his sentence. The court thus

finds the error, assuming it constituted a constitutional violation, to be harmless as it did

not have a substantial and injurious effect or influence in determining the jury's verdict.

**Effective Assistance of Counsel**

Petitioner contends that his trial counsel was constitutionally ineffective because

he did not file a motion to have Irigonegaray removed from his criminal case, despite

petitioner's request that his counsel do so. Similarly, petitioner contends that his

appellate counsel was constitutionally ineffective during his direct appeal because he

did not raise the issue of Irigonegaray's conflicts. See R. VI, 42, 54, 56–57.[9]

> To prevail, [petitioner] must establish trial counsel's (1) "representation fell
> below an objective standard of reasonableness," and (2) there is "a reasonable
> probability that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668,
> 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).... Our review is "highly
> deferential." *Id.* at 689, 104 S.Ct. 2052. Recently, the Supreme Court recognized
> *Strickland* created a general standard, thus giving "a state court ... even more
> latitude to reasonably determine that a defendant has not satisfied that standard."
> *Knowles*, 129 S.Ct. at 1420; *see also Yarborough v. Alvarado*, 541 U.S. 652,
> 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule
> application was unreasonable requires considering the rule's specificity. The
> more general the rule, the more leeway courts have in reaching outcomes in
> case-by-case determinations"). Thus, our review should be "doubly deferential."
> *Knowles*, 129 S.Ct. at 1420. And we "indulge in a strong presumption that
> counsel's conduct falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the presumption that, under the
> circumstances, the challenged action might be considered sound trial strategy."
> *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted).

*Welch*, 607 F.3d at 702. The standard for assessing appellate counsel's performance is

---

[9]Under Kansas law, a claim of ineffective assistance of counsel is generally not
procedurally defaulted by a defendant's failure to raise it on direct appeal. *Murray v.
Cline*, 2010 WL 2696770, *8 (D.Kan. 2010). Petitioner properly raised this issue in his
collateral proceeding under KSA § 60-1507, and the Kansas Supreme Court addressed
it on the merits. This court does the same.

the same as that applied to trial counsel. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

The Kansas Supreme Court, in addressing petitioner's claims of ineffective assistance of counsel, applied the *Strickland* standard, although without mentioning that case, stating:

> To obtain a reversal of a conviction based upon ineffective assistance of trial counsel, it is insufficient to surmise, with the benefit of hindsight, that another attorney would have tried the case differently. First, the defendant must establish that counsel's performance was constitutionally deficient, which requires a showing that counsel made errors so serious that his or her performance was less than that guaranteed to the defendant by the Sixth Amendment to the United States Constitution. Second, the defendant must establish that counsel's deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial. [*Bledsoe*] 283 Kan. at 90, 150 P.3d 868.

*Pabst*, 287 Kan. at 16. *See Bledsoe v. State*, 283 Kan. 81, 150 P.3d 868 (2007) (citing *Strickland*, 466 U.S. at 687).

Applying the deferential standard of review, this Court cannot find that the decision of the Kansas Supreme Court regarding petitioner's trial or appellate counsel was either contrary to, or an unreasonable application of federal law. Petitioner is not entitled to habeas relief on this ground. *See Welch*, 607 F.3d 674; *Trice v. Ward*, 196 F.3d 1151, 1160 (10th Cir.1999).

**Evidentiary hearing**

The court finds an evidentiary hearing is not required in this case. "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Anderson v. Att'y Gen. of Kansas*, 425 F.3d 853, 859 (10th Cir. 2005) ("an

evidentiary hearing is unnecessary if the claim can be resolved on the record.")

**IFP Motion (Dk. 2**)

Petitioner filed a motion to proceed in forma pauperis, and timely supplemented it, as directed by the court, with his certified financial statement from his institution. No partial payments have been ordered or made. Pursuant to 28 U.S.C. §1915, petitioner is required to pay the full amount of a filing fee. Having reviewed petitioner's documents, the court grants petitioner leave to proceed in forma pauperis. Petitioner remains obligated to pay the full $350.00 filing fee in this action through payments made over time from his inmate trust fund account as authorized by 28 U.S.C. § 1915(b)(2).[10]

IT IS THEREFORE ORDERED that the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dk. 1) is denied.

IT IS FURTHER ORDERED that petitioner's motion for leave to proceed in forma pauperis (Dk. 2) is granted, and that payment of the $350.00 district court filing fee proceed as authorized by 28 U.S.C. § 1915(b)(2).

Dated this 8th day of September, 2010 at Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

---

[10] Pursuant to § 1915(b)(2), the Finance Office of the facility where plaintiff is confined is directed by copy of this Order to collect twenty percent (20%) of the prior month's income each time the amount in plaintiff's account exceeds ten dollars ($10.00) until the filing fee has been paid in full. Plaintiff is directed to cooperate fully with his custodian in authorizing disbursements to satisfy the filing fee, including but not limited to providing any written authorization required by the custodian or any future custodian to disburse funds from his account.